FIELD, P.,
dissented as follows:
In 1841, Jas. E. Horner, the appellant, drew his negotiable note for the sum of $2,000, payable at the Farmers Bank at Lynchburg, sixty days after date, to Dolan, Kinnier & Co. The note was indorsed by Dolan, Kinnier & Co., and Jno. M. Speed, the appellee, and discounted at the bank for the accommodation of Horner, to whose credit the proceeds were applied. The money was borrowed for the use of the mercantile firm of Horner & Watson, composed of the said Horner and William H. Watson, and the money was paid out by the bank to the orders of the firm. The note, not being paid at maturity, was protested for non-payment, and the appellee, having received due notice of protest, paid the full amount of the note and costs of protest to the bank, on the 4th of February, 1842. Horner & Watson, having failed in business, petitioned for the benefit of the bankrupt law, and on the 14th'of May, 1842, they were declared bankrupts. On the 15th of September following, the final decree was rendered, by which they were relieved from the payment of their debts. The appellee proved his debt before the commissioner in bankruptcy as a debt due from Horner & Watson. It consequently constituted one of the debts, *from the payment of which both James E. Horner and William H. Watson were released by the proceedings in bankruptcy.
By the discharge in bankruptcy, the legal obligation to pay the debt was at an end, but a bankrupt as under a moral obligation to pay his debts, although the legal remedy of the creditors be barred by his certificate. Consequently the law will give effect to an express, distinct promise made by the bankrupt, without any other consideration than this moral obligation to pay the debt from which he has been discharged by the proceedings in bankruptcy. Chitty on Contracts, p. 190. The appellee, believing that Horner had made to him a valid new promise to pay the debt, instituted an action, of assumpsit against him on the 12th day of January, 1850. The declaration contains two counts. In the first count, the plaintiff sets forth the proceedings in bankruptcy, and declares on a new promise to pay on request. In the second count, he sets forth the proceedings in bankruptcy, and declares on a promise to pay when able, and avers that the defendant was able to pay. The defendant demurred generally to the declaration and to each count of the declaration, in which the plaintiff joined. The defendant also pleaded non-assumpsit, and the statute of limitations, on which issue was joined. He also tendered four other special pleas, which were rejected by the court. The demurrers to the declaration and to each count thereof were very properly overruled by the court. And with equal propriety the four special pleas were rejected, about which nothing more need be said, except in relation to the 4th plea. In the argument of the cause before this court, whilst the appellant’s counsel have been silent as to the judgment in overruling the demurrers, and in rejecting the 3d, 5th, and 6th pleas, they have earnestly insisted upon the validity of the 4th plea as a bar to the action. Upon that plea only I will submit a few remarks. Disregarding the exceptions taken to the form in which the plea has been drawn, and regarding it to *be in form and substance what the pleader intended it should be, what is it? The plea in effect is, that more than five years had elapsed from the maturity of the negotiable note referred to in the declaration, before the suing out of the original writ in this cause, and that the promises in the declaration mentioned had reference to the debt purporting to be due by the original note, and consisted of words only, and were not made and contained in writing.
When Speed paid the debt to the bank, which he did previous to the filing of the petition in bankruptcy, he became the creditor of Horner, and from that time had a good cause of action upon which a suit against Horner might have been maintained. Against the right to bring this suit, the statute commenced running from the instant that Speed paid the money to the bank, and continued to run until the proceedings in bankruptC3 were had. These proceedings suspended Speed’s right of action against Horner, and the right of action being suspended, the running of the statute of limitations was also suspended, (Braxton v. Wood’s adm’r, 4 Grat. 25; Bowles’ ex’or v. Elmore’s adm’r, 7 Grat. 385,) and remained suspended until the 15th day of September, 1842, when, by the final decree in the proceedings in bankruptcy, Horner was forever discharged from his legal obligation to pay the debt to Speed, and as a consequence the remedy by action became extinct, and nothing remained against which the statute could operate. After this, there was nothing left for Speed, but the moral obligation of Horner to pay the debt, which he might perform or not, at his own free will and *874 pleasure. Against an obligation of this sort the statute of limitation can never run, nor is its performance to be presumed from lapse of time. The cause of action in the case before the court did not accrue until the moral obligation of the appellant to pay the money became a valid legal obligation by the making of the new promise referred to in the declaration. Prom the date when that new promise took effect, the statute of ^limitations commenced running, to wit, on the promise set forth in the 1st count of the declaration from the date on which it was made; but on the promise set forth in the second count of the declaration, from the time when Horner became able to pay the money. Waters v. the Earl of Thanet, 42 Eng. C. L. R. 899; 1 Rob. Prac. 539. The second plea puts this defence in issue, and it is to be considered in deciding upon the demurrer to the evidence. Eor the reasons above assigned, I think the 4th plea was properly rejected by the circuit court.
Before proceeding to consider the demurrer to evidence, it may be well to advert to some.legal principles which apply in this case, and more especially to the established practice in the courts of Virginia in deciding upon a demurrer to evidence.
First, as to the liability of appellant upon his new promise to pay. When a man becomes a bankrupt and obtains his discharge, the debts are established by the decree, and they remain subsisting debts, until paid out of the estate of the bankrupt upon which the decree operates; but from all personal legal obligations to pay the debts the bankrupt is forever released and discharged, and the creditors can look to the bankrupt’s estate alone for payment of their debts. Yet, as the bankrupt was once legally bound to pay the debts, he is regarded as being morally bound 'to pay them still, if he should ever become able to do so. Therefore, the law will consider this moral obligation a sufficient consideration to support a new promise by the bankrupt to pay a debt from which he has been so released. Chitty on Contracts, 47 and 390. If such new promise shall be made, it will have the effect, if properly plead, to remove the bar arising from the proceedings in bankruptcy, and will enable the creditor to maintain a suit for the recovery of the money upon the original cause of action. Cases in vols. 3 and 4 Wash. C. C. R. Or an action of assumpsit, like the present action, may be maintained on the new promise as a fresh cause of ^action. When a man has been relieved from the payment of his debts by a legal proceeding without ever having paid one cent of the money, if he be an honest man, he must always feel the influence of this moral obligation, and be willing to express his intentions to pay the debts if he should ever become able thereafter to do so; and under the influence of circumstances, is very liable thoughtlessly and without due reflection, to make loose declarations, which, if strictly construed against him, would constitute valid and binding new promises of payment. The law, in tenderness to his very delicate and embarrassed state of feeling, steps in to his relief and will shield him if possible from the consequences of his heedless and improvident declarations. It therefore declares that a new promise, to be binding; must not be a mere declaration of a wish or intention to pay the debt. Brown et ux v. Collier, 8 Humphrey, 510; Yoxtheinier v. Keyser, 1 Johns. 364; Prewett v. Caruthers, 12 Smedes & Marshall, 492. But the promise must amount to a direct, positive, certain and unqualified engagement made with the creditor or his agent to pay the debt, showing also at the same time a willingness to pay it, either then, or at some specified time thereafter, or when able. Bloodgood v. Bruce, 4 Selden, 357; Bell v. Morrison, 1 Peters, 371; Besford v. Saunders, 2 Henry Blackstone, 116. Other cases of the same import might be cited if necessary.
Secondly, as to the evidence. A demurrer to evidence admits the credibility of the witnesses. It also admits whatever a jury might reasonably infer from the evidence. Fowle v. Common Council of Alexandria, 11 Wheat. 320-323. And when the party by demurring takes the question from the jury, the court is not to be scrupulously nice to adjust the balance of the evidence, but will be extremely liberal in their inferences from the testimony’ against the de-murrant. U. S. Bank v. Smith, 11 Wheat. 171; Patrick v. Hallett & Bowne, 1 John. Rep. 241. Any inference which the jury might, with the slightest propriety, make from *the evidence, is to be conceded Eor it never was intended that by a demurrer to evidence, the court should become the triers of the facts. Dickey v. Putnam’s adm’r, 2 Sergeant & Rawle, 413. See Whittington v. Christian, 2 Rand. 353; Green v. Judith, 5 Rand. 1. They are the ruling cases in Virginia.
Regarding the above legal principles as binding upon us in this case, I will now proceed to consider the evidence as set forth in the demurrer. That evidence clearly establishes sundry facts, to wit: The payment of the negotiable note by Speed, as the surety for Horner; the proceedings in bankruptcy’, and the release thereby of Horner from his obligation to refund the money to Speed, and the ability of Horner to pay the debt at the time the suit was brought. But upon the evidence offered by the plaintiff to support the promises set forth in the declaration there is a question, and it is the only one about which there is any sort of difficulty in this cause. The only testimony that was introduced to prove the promises was that of a man by the name of Roane, an attorney at law, who had been employed by Speed as counsel, to endeavor to collect and arrange the debt with Horner, and who promised Speed that he would avail himself of every proper means to do so. The testimony of Roane, as given in upon the trial, consisted of a *875 written memorandum, made out by him, signed R R, of a conversation which the witness had with Horner on the 5th of November, 1849, and his answers to the questions propounded on the examination by the defendant’s counsel, and to the questions propounded by the plaintiff's counsel. In considering the testimonj' of Roane, we must regard statement R R, and the answers given to the questions asked, altogether as one entire whole. But, nevertheless, inasmuch as the testimony of Roane refers to an admission of a promise made at a certain time and place, and also to an admission of other promises made at other times and places, and contains a statement x'also of what else was said to him by Horner on the 5th day of November, 1849, we must so far separate these three classes of the evidence from each other, so as not to confound them, nor permit what was said on one occasion to serve to qualify, illustrate or explain the meaning of what may have been said on a different and distinct occasion. I am induced to make this preliminary remark to forewarn myself against taking a confused view of the evidence by regarding the same as one entire whole, in deciding upon the several branches of this case. From statement R R, it appears that on the 5th of November, 1849, Horner made an admission to the witness that he had several times promised to pay the debt when able, and always intended to pay the said debt to Speed. It also appears from the said statement R R and the answers of the witness to certain questions propounded on the trial, that Horner admitted that he had recently before that day, on the road between Amherst C. H. and Hynchburg, promised Speed to pay the debt. There were, then also, things spoken and said by Horner to Roane, for the first time, which appear to have made strong impressions on the mind of the witness, in relation to these promises. These last mentioned remarks were unquestionably wholly unconnected with the said promises, and constitute no part of the res gestae of either, or any of the admitted promises. In considering the testimony of Roane these several matters, and the line of separation between them, should not be lost sight of. If this rule can be strictly adhered to, I humbly conceive there will be but little difficulty in arriving at a correct conclusion.
What, then, are the material parts of the testimony of Roane? First, as it respects the promise set forth in the second count of the declaration. The testimony in relation to that promise is very short. It is set forth in statement R R, and is not changed by any other part of Roane’s testimony. In reference to the note of *$2000, which Speed had paid for Horner as his endorser, Mr. Roane testifies that “Mr. Horner then said that since taking the benefit of the bankrupt law of the United States, he had several times promised to pay that debt, as soon as he was able, and he always intended to pay I said debt to Mr. Speed.” Now', here is evidently one of those vague and loose declarations of a promise which the law> holds invalid; for neither the place where, the time when, no" the person to whom the promise was made, is mentioned. To make \ a promise valid, it should be made to the Í creditor or his agent. 4 Selden, 357 ; 6 Harris, 286. That fact can not be implied; it I must be distinctly proved, being an essen-I tial part of the contract. These words do | not, therefore, amount to that positive, di- \ rect and unequivocal engagement which the law requires in order to make it valid and binding. It amounts only to the declaration of an intention to pay. It is the intention entertained by every bankrupt who is an honest man; and it would be fully as reasonable to sue him upon the entertaining of this intention, as upon its avowal, by such loose declaratory words. There is, in my opinion, nothing in the record to justify entering a judgment for the plaintiff on the second count of the declaration.
What is the evidence in regard to the first count? Although the demurrant concedes absolute verity to the testimony of the witness, and is, by force of his demurrer, estopped from calling in question the character and veracity of the witness, yet it is evident, from the questions put to the witness, that the defendant intended to lay a foundation for impairing the weight of his testimony; and notwithstanding the filing of the demurrer, since the witness was examined, the answers given by the w'itness which have that tendency, have not been lost sight of in the argument before this court, evidently to impair the weight of his testimony. The witness, immediately after having the conversation with Horner on the 5th of November, made out a written memorandum of the conversation. This memorandum *was not so full as the witness thought it might have been ; therefore, at the request of Speed, he made out the statement R R, embracing all that was in the first memorandum, and more besides. Having done this, he tore up the first memorandum as useless paper, and threw it in the fire-place. On his examination in court he testifies to sundry other facts, not stated in either of his written memoranda. If you give a strict, literal construction to his answer to the first interrogatory of the appellant, he says he went from the plaintiff to the defendant, and sought an interview with him, in order to bring about a conversation with the defendant, to see if he could not get an acknowledgment or assumpsit for his liability; and then, in the course of his subsequent examination, he four times at least said that his meeting with Mr. Horner was accidental. These apparent inconsistencies or contradictions have been adverted to in argument. The witness was asked whether he informed Mr. Horner, on that occasion, that he was acting as the counsel of Mr. Speed. And why was this question asked? but to show that there was *876 something' disingenuous, or insiduous, in the conduct of the witness in not revealing his true character to Horner, as counsel for Speed, and thereby put Horner on his guard. Ho.w, suppose that Roane had justly incurred censure, and had so acted as to warrant a jury in disbelieving or discrediting his testimony, can that weigh as a feather with this court in deciding upon the demurrer to his evidence, when the appellant himself admits upon the record, by filing his demurrer, that the witness is worthy • of all credit, and whose veracity can not be called in question, and admits further, that all that he has sworn to is true? How is he to escape from this admission? Surely not upon grounds like those upon which he seeks to get rid of the payment of the debt he owes Speed, to wit: that it was a mere loose, vague, indefinite acknowledgment, that he had no intention at the time of complying with. But I think the appellee in this case could well afford to relieve him *from this record admission, and let the reputation of Roane stand or fall by the evidence he has given in this cause.
Speed had a conversation with Roane in relation to his claim on Horner, and told him that in traveling together from Amherst Courthouse to Lynchb.urg, Horner had made him a verbal promise to pay the debt, and he proposed to employ Roane as his counsel to collect or arrange the debt for him. Roane agreed to become his counsel, as already mentioned. Several days afterwards he met with Mr. Horner accidentally, and sought an interview and conversation with him in relation to the debt. His object, no doubt, was to make some valid arrangement with Horner for the payment of the debt. It cannot be supposed that his object was, in a sly, insidious way, to get Horner to repeat to him the same verbal promise which Horner had made to Speed. Roane declares that such was not his object, and his answer is sustained in this respect by reason and probability. Roane did not believe in the efficacy of a verbal promise. Then what motive had he to be guilty of the silly thing of inveigling the unsuspecting mind of Horner into a verbal acknowledgment or promise, which, when made, would be void? Horner may have believed, as Roane did, that a verbal promise was not binding; yet, on the occasion of this interview, he seems to have had some misgivings about it. He became uneas3, and asked Roane what he thought of it. Roane, being Speed’s counsel, might very properly have declined to answer the question. But he says he did answer it, and thinks he said to Mr. Horner that, in his opinion, a verbal promise would not be binding.
The cross-examination of the witness, which was of the most searching and scrutinizing character, was well calculated to disparage him and to harrass and distress his feelings ; nevertheless, throughout the whole course of the examination, as a man of truth and honest motive should, and on such occasions always would, act, if the frailty of his temper would permit him to *do so, he remained calm and patient, and answered promptly every question that was put to him by either party, regardless of the consequence of his answers to himself or the cause. This is not the only evidence of his fairness and un • biassed impartiality. He did not consider the promise which Horner had made to Speed of any binding force, because it was verbal — in which opinion, by the way, he was clearly wrong — and he also became thoroughly satisfied, after having had this conversation with Horner, from what Horner there said, that Horner never had intended to bind himself, and would not bind himself in any shape or form. These were the mere opinions of the witness, and were, therefore, not proper evidence to go before the jury; and, besides this, they were both erroneous, the first because it was against law, the second because formed on an erroneous basis. A contract made by a man to-day is not to be explained, changed or modified by declarations made by him a week hence; yet this witness, acting upon a noble principle, “nothing extenuate, nor set down aught in malice,’’ comes forth with the open frankness of a’ man of upright intentions and throws into the scales of justice the imposing influence of these opinions in favor of the appellant. After making these remarks, it can’t be necessary to say, that Mr. Roane deserved to stand high in our estimation as a man of truth and veracity.
In order to ascertain what part of the testimony of the witness relates to the promise, we must take so much of statement R R as relates to it in conjunction with the answers of the witness to the 6th, 18th and 40th questions. We must exclude from our consideration all the testimony hereinbefore recited relating to the conditional promise, because it is separate and distinct from all the testimony in relation to the absolute promise made in the road between Amherst C. H. and Lynchburg. We should also exclude from our consideration all the opinions of the witness of the invalidity of the promise, and that Horner did not intend *to bind himself, and that he would not bind himself in any shape or form, because the decision of this case is not to be ruled or influenced by the opinions of the witness, but upon facts proved. The opinion of a witness is not a fact — it is a conclusion. It is the province and duty of the court to consider the facts and draw conclusions. To permit a witness to perform this office is yielding to the witness the judgment seat. Stripping the testimony of the witness of all these extraneous matters, and bringing together in a consolidated form all that he has said in relation to the abso-luté promise, without, repetition, the sum total of that testimony is as follows:
“Mr. Horner stated, that he had recently had a conversation with Speed, on their way from Amherst C. H. to Lynchburg, *877 and had promised to pay the said debt to Mr. Speed, and that he told Mr. Speed that he would have given his bond for the said debt but for a promise he had made his father-in-law, Mr. Watson (who started him in life since his failure and availing himself of the bankrupt law) that he would not give a bond for any of his old debts.”
I mark these words as a quotation, because they are the very words (all useless repetition being avoided) which constitute the testimony of the witness in relation to the absolute promise. Several other questions were propounded to the witness in reference to that promise, and were answered negatively, from which it seems that, at the time of making this promise, nothing was said by Horner to explain or qualify it, nothing about its being a conditional promise, nothing to indicate an intention not to be bound by it, nothing was. said as to when, how or where the money was to be paid. The question, therefore, depends upon the effect and meaning of the words above quoted. Do they constitute a valid new promise to pay the debt in question on request, or could a jury infer therefrom such a promise? If these words be true, as they surely are — but, whether or not we are bound to regard *them as true — they establish a promise beyond all question. It cannot be said to be a loose, vague promise, made as a mere matter of idle chat in the course of a casual conversation; for so sincere and deliberate was the purpose of Horner, and so binding did he then regard the promise to be, that at the time of making the promise, he assured Mr. Speed that he would give his bond for the debt but for the promise made to his father-in-law not to give a bond for the payment of any of his old debts. It can’t be believed, that a man would give a bond for the payment of a debt for which he was not bound and did not intend to pay. We must, therefore, ascribe to Mr. Horner the credit of having made a valid promise, which he then honestly intended to comply with, and assigning a true and good reason for not giving his bond, or we must ascribe to him the discredit of making a deceitful promise, which he did not mean to fulfill, and assigning a false reason for not giving a bond for its performance. I will not be so uncharitable as to place Mr. Horner in the last mentioned dilemma.
I have found two reported cases which, I think, will serve to illustrate the binding efficacy of Mr. Horner’s promise. The first is the case of Lobb v. Stanley, 13 Law Jour. new series, Q. B. 117. The question arose on a note in writing from Stanley to Robb. Ret it be remembered that such promises, under the English statute of 1825, (the bankrupt act,) are required to be in writing. We have no such provision in our Code. A promise made here is, therefore, equally binding, whether made in writing or by' words only. Mr. Stanley’s note was as follows, to wit:
“Mr. Stanley begs to inform Mr. Robb that he would take an eárly opportunity of settling'his account, but Mr. Stanley objects to give his bill. Mr. Stanley regrets that he has been prevented answering Mr. Robb’s letter before.”
Held sufficient to render a certificated bankrupt liable to a debt incurred before his bankruptcy.
*1 will slightly, without changing its substance, paraphrase Mr. Horn-er’s promise, and place it side by side with Mr. Stanley’s:
“Mr. Horner promises to pay Mr. Speed the amount of the negotiable note, and would give his bond for the amount, but he has promised his father-in-law, (who has been kind to him,) not to give his bond to pay any of his old debts.”
This is certainly a much stronger case against Horner than the one above referred to was against Stanley.
The other is the case of Pratt v. Russell, 7 Cush. 462. The defendant was requested to give a note for the debt. He refused to do so, “not being willing to put principal and interest in a new note;” but said, “I have always said, and still say, she shall have her pay.” Held, that a jury might properly construe these words as an unequivocal promise to pay.
If these words were sufficient to make a valid engagement, surely the promise made by Horner must be also sufficient. The case of Steward’s adm’r v. Dolan’s adm’r, . has been referred to by the appellant’s counsel, as a strong case in point in his favor. That case was decided by the old Special Court of Appeals In 1851. I was a member of the court, but have a very faint recollection of the case, or the principle upon which it was decided. My recollection of it is too indistinct to have any influence on my own mind, but I can clearly perceive a very important difference between the two cases. The meeting between Eloyd, the creditor, and Dolan, the debtor, was accidental, and occurred on Main street, in the town of Rynchburg. Eloyd spoke to Dolan about the debt. Dolan said, “he was now getting under weigh again, and that he would pay the balance of the debt.” The promise to pay must be taken in reference to its antecedent. He was now getting under weigh —meaning he was getting able — and promised to pay the balance of the debt — meaning thereby when he got able. This promise was clearly referable to the previous words, getting under way'— *that is to say, acquiring ability' to pay', and meant that he would pay when that ability was acquired. The declaration in the. case was on an absolute promise.
In this case, the testimony in the demurrer is indistinct as to the date of the promise. It was made recently before the 5th November, 1849, from which the jury could reasonably infer that it had been made within five years next before the suit was brought, which removes the bar of the statute of limitations.
1 I am, therefore, for affirming the judg *878 ment; but, as a majority of the court think otherwise, it must be reversed, in accordance with their opinion, with costs, and judgment entered for the defendant Horner.
Judgment reversed.